Robert FINDLEY *v.* STATE of Arkansas

CR 89-48                                    778 S.W.2d 624

Supreme Court of Arkansas
Opinion delivered October 30, 1989
[Rehearing denied December 4, 1989.]

*Val P. Price*, for appellant.

*Steve Clark*, Att'y Gen., by: *Kay J. Jackson Demailly*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. Robert Findley appeals from his capital felony murder conviction resulting in a sentence of life without parole. We find merit in one of the assignments of error and, accordingly, the case is reversed and remanded.

In March, 1988, the Trumann, Arkansas Police Department

began an investigation into the disappearance of David Phillips. Phillips had withdrawn $1,800 in cash from his savings account on Wednesday, March 2. Phillips told co-workers on the night shift at the plant where he worked that he had given $1,700 in cash to Robert Findley to buy a 1987 Tempo automobile through a Memphis contact of Findley's. The car was to be delivered to Phillips by Findley that evening during the 10:00 p.m. break. Because Phillips had neither a bill of sale nor a receipt the others teased him for having been "ripped off." When Findley had not arrived with the car by 11:00 p.m. Phillips left work early to investigate. Next day Phillips told his co-workers there had been some problem about getting title to the car, but that he was to get delivery on Friday. Phillips was last seen by his co-workers on Thursday, March 4.

On March 9 and again on March 10, at the request of the Trumann police, Findley went voluntarily to police headquarters. He was questioned informally on March 9 and returned on the 10th for a taped interview. He was not under arrest. After his Miranda rights were explained, Findley told Lt. Toddy he and Phillips had gone to Memphis on Wednesday, March 2, to look at cars being sold by Ron Davis, an acquaintance of Findley's. Phillips saw a Tempo that he wanted so they came back to Trumann, where Phillips made a withdrawal from his savings account and gave $1,700 to Findley to buy the car while Phillips was at work. Findley said he agreed to bring the car to the plant that night but because of a flat tire he decided to go the following day. He said that sometime after midnight Phillips came to his house and wanted his money back, which Findley said he gave him; that on Friday afternoon he and Phillips went back to Memphis but were unable to contact Ron Davis and Findley said he told Phillips to "forget it." Findley dropped Phillips off at his house in Trumann and later that evening, at his wife's urging, he went back to invite him over to play cards. Phillips declined and Findley said that was the last time he saw him. Findley denied any knowledge concerning Phillips's whereabouts or disappearance. After the taping Findley left the station.

On Thursday, March 24, the body of David Phillips was discovered in a drainage ditch in Craighead County, weighted with concrete blocks. Death was attributed to multiple bullet wounds in the upper torso from a weapon which later proved to be

Findley's. On the following day Robert Findley was arrested on an outstanding hot check charge and taken first to Trumann Police Headquarters and then to the Craighead County Sheriff's Office. Between March 27 and March 29, Findley gave the police three statements. In the first he implicated James Moore, who had, he said, told him he had robbed and killed Phillips with a pistol belonging to Findley, which Moore had stolen. In the second Findley said that Ron Davis had robbed and then killed Phillips in Findley's presence, that Findley had then brought the body back from Memphis and Moore had helped him dispose of it. In the final statement Findley said that he and Moore had planned to rob Phillips, though not to murder him, but that Moore had shot Phillips in the course of the robbery.

Findley's first assignment of error and the one that necessitates reversal concerns the denial of his motion to suppress the statements he gave after he was taken into custody. Appellant argues that once an accused asserts the right to refuse interrogation by police officers any statements obtained thereafter are inadmissible, unless it is the accused who initiates further conversation with the officers. That principle of law was expressed in *Edwards* v. *Arizona*, 451 U.S. 477 (1981):

> ". . . we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold, that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him. . . ." [451 U.S. at 484-485].

This court has adhered to that standard in a number of cases: *Bussard* v. *State*, 295 Ark. 72, 747 S.W.2d 71 (1988); *Glisson* v. *State*, 286 Ark. 329, 692 S.W.2d 227 (1985); *Hendrickson* v. *State*, 285 Ark. 462, 688 S.W.2d 295 (1985).

Applying that principle to this case, we are reminded that custodial statements are presumed to be involuntary and thus the burden rests upon the state to prove Findley's statements were properly obtained, freely and intelligently given, without

fear or favor. *Scherrer* v. *State*, 294 Ark. 227, 742 S.W.2d 877 (1988); *Fleming* v. *State*, 284 Ark. 307, 681 S.W.2d 390 (1984). Moreover, while we concede the trial judge is better able to assess credibility, we review the proceedings below *independently* of the trial court and base our conclusions on the totality of the circumstances. *Douglas* v. *State*, 286 Ark. 296, 692 S.W.2d 217 (1985); *Hayes* v. *State*, 274 Ark. 440, 625 S.W.2d 498 (1981). Viewed in that light, if we find the evidence to preponderate against the findings of the trial court, then it is our duty to reverse.

At the suppression hearing Robert Findley insisted that he asked to have a lawyer present during interrogation and at other times for the questioning to stop until a lawyer was present. He contends these requests were disregarded or brushed aside with the comment that he did not need a lawyer. He maintains that he was alternately threatened by intimations of being "taken out in the country" or enticed by assurances of assistance. Believing that the officers intended to help him, he testified that he eventually agreed to give a taped statement which included an assertion that he was speaking voluntarily and without the desire for a lawyer.

If those contentions were unsupported, we would have little hesitancy in adopting the trial court's view that Findley's testimony lacked credibility. But they are not. In fact, we find persuasive corroboration from a number of factors in the record. Ed Barry, a Jonesboro attorney, testified that about a week before being arrested Findley consulted him about representing him and Barry quoted a fee and retainer which, he understood, Findley was trying to raise. Then on the morning of March 25, Findley called Barry in an excited state to say that he had learned he was about to be arrested and Barry said he told Findley what to expect and what to say in regard to having an attorney present before being questioned.

When Barry learned an hour or two later that Findley had been arrested, he called the Craighead County Sheriff's Office and spoke to Lt. Brogden, telling him that Findley should not be questioned without a lawyer. He said about 3:30 or 4:00 p.m. Findley called him from the sheriff's office and Barry said he told Findley to hold the telephone away from his ear and repeat the following words so that Barry could hear them being spoken, "I

don't want you to talk to me until my lawyer is present." Findley told him Officer Bud Moxley was in the room with him as he repeated the message. Neither Lt. Brogden nor Officer Moxley denied Barry's testimony and Barry's contact in Findley's behalf is further evidenced by the fact that Barry's name and telephone number were written by one of the officers at the top of the Miranda form signed by Findley. Curiously, another Miranda form signed by Findley in conjunction with the statement dated March 28, was missing and could not be produced.

■ The state's response to Barry's testimony is that Findley was merely "parroting" what Barry told him. Assuming that to be an accurate characterization of the proof, it does not alter the result. Findley was expressing, whether spontaneously or by rote, the constitutional privilege afforded him under the Fifth Amendment. He was entitled to have the privilege respected.

From what has been said, it should be clear we find Barry's testimony credible. But there is additional corroboration. At least five officers were involved in the interrogation of Findley. Three of them stoutly denied that Findley ever requested counsel, but the testimony of two, Lt. Toddy and Jerry Bland, Chief of the Trumann Police Department, makes it clear Findley made known his desire for an attorney. During his testimony in chief, the prosecutor asked Chief Bland:

Q: Did Mr. Findley appear to understand his rights?

A: Yes, sir.

Q: Did he ever ask Officer Howell to stop, *that he wanted an attorney present?*

A: *Yes, he did.*

Q: Okay. Let me back up. Did he tell Officer Howell to stop, that he didn't want to answer any questions, that he wanted an attorney present?

A: No he did not. *He just made a statement that he thought he needed an attorney.* Then he went on to say, well, I will talk to you.[1] [Our emphasis.]

---

[1] Record, p. 153.

While that testimony appears ambivalent, it is clear that at the very least Findley voiced the need for an attorney. The testimony of Lt. Toddy adds credence to that conclusion. At two separate points in the suppression hearing Lt.Toddy testified unequivocally that Findley told him he wanted a lawyer present.

> Q.   And did he ever at the beginning of this or at any time ever tell you that he wanted an attorney present or he wanted to remain silent, he wanted to do anything in those that are outlined in those rights which are contradictory with giving a statement?

> A:   Between $3/10$ and somewhere—let me look in my file for a minute (witness examining file). *On March 12th he indicated that he wanted an attorney and I ceased talking to him.*[2] [Our emphasis.]

Recalled to the witness stand at a later point, Lt. Toddy again testified, "As I stated earlier he indicated to me on the 12th of March that he wanted an attorney and I didn't talk to him anymore."[3]

Plainly Lt. Toddy was mistaken as to the date, as Findley was not in custody on March 12. Nor is it likely that Lt. Toddy could have been referring to March 10. At that point all the police knew was that David Phillips was missing, and while they may have suspected Findley of foul play, he was not under arrest, had come to the station voluntarily and left after supposedly telling the police all he knew. Thus it is implausible that Findley would have requested a lawyer on March 10 and nothing in the statement itself suggests that the questioning was terminated because Findley wanted an attorney. After some six pages of questions and answers the recorded interview simply states, "End of statement." Thus we think Lt. Toddy's testimony, while faulty as to the date, is substantively accurate and supports the conclusion that Findley did, as he maintains, request counsel during the course of his custodial detention.

▪   When the facts and circumstances established at the suppression hearing are examined in their entirety, and weighed

---

[2] Record, p. 173.
[3] Record, p. 266.

against the rule that custodial statements are presumed to be involuntary, *Smith* v. *State*, 286 Ark. 247, 691 S.W.2d 154 (1985), we cannot avoid the conclusion that Findley made it clear that he was invoking his rights under the Fifth Amendment and that he never thereafter initiated any renewal of the interrogation process so as to permit the resumption of questioning. *Edwards* v. *Arizona*, 451 U.S. 477 (1981). Indeed, the state does not even contend that Findley initiated renewed questioning.

In reaching this decision, we are not relying on Ed Barry's status as an attorney acting on behalf of Robert Findley. He candidly admitted that he had not been retained by Findley, that his employment was entirely prospective. It is enough that in his role as a participant or witness to the events surrounding the arrest, custody and interrogation of Robert Findley, Barry's testimony undergrids the conclusion that Findley himself made known his desire to assert his Fifth Amendment right to counsel. That alone is sufficient here.

We note, too, that Findley's argument that his statements were given in hope of reward is not entirely unfounded. Chief Bland testified he told Findley:

> . . .We don't want you to do anything except tell the truth. We are not here to make any deals with you. We are not here to make any promises that we can't fulfill. All we want is the truth. I am not going to tell you something and this is all being taped and we can't deny it and you can't deny it. You are getting yourself in bad, bad business if you don't tell the truth. You are facing some serious trouble if you don't lay all of the stuff out here. *You may be facing some anyway, but we cannot promise you anything. We can try to help you in a lot of ways and can give you a lot of help and advice providing that you lay this thing out here.* But again, I don't want you to get hemmed up and say that we are going to make a deal with you. That is not the point. The point that I am *trying to get across is* to tell the truth, *tell the truth now.* (T. 249.) [Our emphasis.]

We do not decide whether those comments per se would invalidate a confession; it is enough to note they come perilously close. Promises of "a lot of help and advice" to an accused undergoing interrogation are seldom rooted in fact and, more

often than not, prove to be a false hope.

While reversal on the foregoing point of error renders the remaining arguments moot, we mention two other assignments of error. One concerns the denial of a motion for a mistrial. During the state's case the taped statements of Robert Findley were played for the jury to hear. The state had agreed to omit portions of the recording which referred to a polygraph examination Findley had taken. However, in the process of playing the tape the references were not deleted and the jury may have heard the word "polygraph" mentioned twice. It seems unlikely that this inadvertent mistake would recur on retrial.

Lastly, Findley submits the trial court should have granted his motion for a directed verdict at the close of the state's case based on insufficiency of the evidence of a robbery, the underlying felony of the capital felony murder charge. We disagree with the argument.

Robbery is defined in Ark. Code Ann. § 5-12-102(a) (1987):

A person commits robbery if with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another.

In determining the sufficiency of the evidence, we review the proceedings before the trial court without first excluding evidence which may have been erroneously admitted. *Harris v. State*, 284 Ark. 247, 681 S.W.2d 334 (1984). There are several theories by which the jury could have inferred from the evidence that David Phillips was murdered in conjunction with a robbery as defined in the statute. For one thing, one of Findley's statements to the police explained that he and Moore planned a robbery, but Moore went further than Findley intended and shot Phillips with Findley's gun. Another statement was that Findley had returned the money to Phillips on Wednesday night and the evidence in its entirety supports an inference that Phillips was murdered a few days later to recover the funds which Findley knew Phillips was carrying.

Findley also argues that at most the state's proof established no more than a theft by Findley of Phillips's $1,700 followed by a murder four days later, too distant, he maintains,

for compliance with the requirement of the robbery statute that the use of force occur "immediately thereafter." But, as we have noted, the evidence was such that the jury could infer that Findley killed Phillips either to obtain the funds or to silence Phillips when he demanded the return of his money. In *Hall* v. *State*, 299 Ark. 209, 772 S.W.2d 317 (1989), we considered an analogous challenge to the applicability of the first degree murder statute, Ark. Code Ann. § 5-10-102 (1987), which defines the offense as including a death occurring during "immediate flight" from the commission of a felony. Hall was seen by the police driving a car which had been stolen five days earlier. Hall sped away and in the ensuing chase he struck and killed a pedestrian. Hall was convicted of first degree murder, theft by receiving and fleeing. His arguments on appeal included the proposition that because the theft had occurred five days earlier, he was not in "immediate flight" from the commission of a felony. This court rejected that premise on the reasoning that theft by receiving was a continuing offense, citing *State* v. *Reeves*, 264 Ark. 622, 574 S.W.2d 647 (1978).

For the reasons stated, the judgment is reversed and the case remanded to the trial court.