2013 Ark. 201

**Ronald Tywan JACKSON, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 12–859.**

Supreme Court of Arkansas.

May 16, 2013.

Robert M. "Robby" Golden, for appellant.

Dustin McDaniel, Att'y Gen., by: Lauren Elizabeth Heil, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice.

Appellant Ronald Tywan Jackson appeals the order of the Lonoke County Circuit Court convicting him of possession of marijuana with intent to deliver and sentencing him to a term of five years' imprisonment in the Arkansas Department of Correction. On appeal, he argues that the circuit court erred in denying his motion to suppress (1) evidence seized pursuant to an illegal detention, (2) evidence where the warrantless search of his vehicle was not reasonable, and (3) the custodial statement that violated his *Miranda* rights and the fruit-of-the-poisonous-tree doctrine. We affirm.

The record reflects the following facts. On October 26, 2010, at approximately 3:39 p.m., Corporal Trenton Behnke of the Arkansas State Police stopped a pickup truck traveling eastbound on Interstate 40. According to Corporal Behnke, he stopped the vehicle because of an "[i]mproper lane change, cutting in front of a tractor trailer, and following too close." Leonard Maysonet was driving the vehicle, Jackson was the front-seat passenger, and John Fykes was a rear-seat passenger. Upon approaching the vehicle, Corporal Behnke did not notice anything in the bed of the truck but saw fast-food wrappers and a small suitcase in the backseat. Corporal Behnke requested and received Maysonet's identification and the vehicle's rental agreement that showed Jackson as the person who had rented the truck. According to Corporal Behnke, the rental agreement stated that Jackson had rented the

truck in Tennessee on October 22, 2010, at approximately 9:01 a.m. and that the vehicle was due to be returned at 8:00 a.m. on October 25, 2010, the day before the traffic stop.

Corporal Behnke questioned Maysonet about his travels, and Maysonet told the officer that he had been to Dallas, Texas, to visit his cousin for a few days. Corporal Behnke then checked the vehicle's VIN sticker and federal VIN plate, and while doing so, noticed a large road atlas, which he thought was suspicious. Then, the officer asked Jackson for his driver's license and asked him about his travels. Jackson told the officer that the men had been to Dallas, Texas, "to see their girls" and once they arrived in Dallas, they went their separate ways. After backup arrived, Corporal Behnke deployed his dog, K–9 Major, around the truck. Based on the dog's alert, Corporal Behnke then searched the vehicle and discovered four or five Ziplock bags of a green, leafy-vegetable matter, which he determined to be marijuana, inside the one suitcase in the truck.

Jackson was arrested and charged with one count of possession of marijuana with intent to deliver. He filed a motion to suppress the evidence and his roadside and custodial statements, asserting that the officer had conducted a warrantless and unreasonable search and seizure of the vehicle in violation of his rights under the Arkansas Rules of Criminal Procedure, as well as the Arkansas and United States Constitutions.

A hearing on the suppression motion was held on July 14, 2011. Therein, Corporal Behnke testified about his stop and subsequent search of the vehicle rented to Jackson. He stated that after pulling the truck over, he first asked for Maysonet's license and the rental agreement and then later requested Jackson's driver's license, as he was the renter of the truck. Corporal Behnke explained that while waiting on the return from the Arkansas Crime Information Center ("ACIC") and after talking with Maysonet and Jackson some more, he became suspicious that they might be transporting narcotics. He also found it odd that when he asked them questions, he did not get immediate responses. Corporal Behnke asked Jackson for permission to search the vehicle, and Jackson said, "[N]o." Corporal Behnke told Jackson he had an officer on the way to assist him and once he arrived, Behnke was going to deploy his dog, K–9 Major, around the vehicle. According to Corporal Behnke, he first allowed the dog to conduct a free-air sniff by letting him run around the vehicle by himself. This was followed by a detailed sniff where the officer presented different areas outside the vehicle. Corporal Behnke testified that K–9 Major's behavior constituted a profound alert, which meant that he was dealing with an odor of narcotics. Corporal Behnke then reported to Jackson that his dog alerted to the odor of narcotics in the vehicle. Jackson told the officer that his girl had smoked marijuana in the truck the day before, and Corporal Behnke advised Jackson that he was going to search the vehicle. Jackson then admitted there were four or five pounds of marijuana in the truck. Corporal Behnke testified that after Jackson was transported to the Lonoke County Sheriff's Office, he was advised of his *Miranda* rights, but refused to give a statement, saying, "There's nothing for me to say because you already have my weed."

At the conclusion of the suppression hearing, the circuit court ruled that it would suppress the roadside statement by Jackson, wherein he admitted that there were four or five pounds of marijuana in the car. But, the circuit court denied the motion to suppress the evidence and the

custodial statement. The circuit court specifically found that Corporal Behnke had not completed the purpose of the stop at the time he deployed the dog, as he was waiting on a return from ACIC on one of the men, and that K–9 Major was reliable and alerted, thereby giving Corporal Behnke probable cause to search the vehicle. Jackson was then tried before the bench on July 14, 2011, found guilty and sentenced as previously set forth.

▪ Jackson appealed his conviction and sentence to the Arkansas Court of Appeals, and the court of appeals affirmed. *Jackson v. State*, 2012 Ark. App. 508, 2012 WL 4194657. Jackson petitioned this court for review, and we granted that petition on November 8, 2012. When we grant a petition for review, we treat the appeal as if it had been originally filed in this court. *See Chambers v. State*, 2012 Ark. 407, 424 S.W.3d 296. We turn now to the issues raised by Jackson.

As his first point on appeal, Jackson argues that the circuit court erred in denying his motion to suppress evidence seized in violation of Rule 3.1 of the Arkansas Rules of Criminal Procedure, as well as the Arkansas and United States Constitutions.[1] While Jackson concedes |₅that the officer's stop of the truck was valid, he asserts that Corporal Behnke illegally detained him after the purpose of the stop had been completed and that the officer lacked reasonable suspicion to continue the investigation. The State counters that because the purpose of the traffic stop had not been completed at the time that Corporal Behnke deployed K–9 Major, the circuit court's denial of the motion to suppress was correct and should be affirmed by this court. Alternatively, the State argues that any further detention of Jackson was supported by reasonable suspicion that Jackson was involved in criminal activity and, thus, the circuit court's denial of the motion to suppress should be affirmed.

▪ In reviewing a circuit court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court and proper deference to the circuit court's findings. *E.g.*, *Menne v. State*, 2012 Ark. 37, 386 S.W.3d 451. A finding is clearly erroneous, even if there is evidence to support it, when the appellate court, after review of the entire evidence, is left with the definite and firm conviction that a |₆mistake has been made. *E.g.*, *Lee v. State*, 2009 Ark. 255, 308 S.W.3d 596. We defer to the superiority of the circuit court to evaluate the credibility of witnesses who testify at a suppression hearing. *E.g.*, *Cockrell v. State*, 2010 Ark. 258, 370 S.W.3d 197. We reverse only if the circuit court's ruling is clearly against the preponderance of the

---

1. Rule 3.1 of the Arkansas Rules of Criminal Procedure (2012) provides as follows:

   A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

evidence. *Ritter v. State*, 2011 Ark. 427, 385 S.W.3d 740.

■ This court has held that a law-enforcement officer, as part of a valid traffic stop, may detain a traffic offender while completing certain routine tasks, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. *Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004). During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered. *Id.* After these routine checks are completed, continued detention of the driver can become unreasonable, unless the officer has a reasonably articulable suspicion for believing that criminal activity is afoot. *Id.*

We are called upon in this case to review the circuit court's finding that the traffic stop at issue here had not been completed at the time Corporal Behnke deployed K–9 Major. Jackson acknowledges that there is case law suggesting that a stop is not completed until the driver's license and any accompanying paperwork is returned, which is precisely what we recently stated in *Menne*, 2012 Ark. 37, 386 S.W.3d 451. But, according to Jackson, we have not established a bright-line rule that a traffic stop cannot be completed before that time.

While we may not have a bright-line rule for when a stop is legitimately completed, our case law has consistently held that a stop is not concluded when the officer has not returned the license, paperwork, or ticket. In *Yarbrough v. State*, 370 Ark. 31, 257 S.W.3d 50 (2007), we noted that during the course of this encounter, the police officer determined that he was going to give the appellant a warning for the traffic violation; but, before doing so, he asked the appellant for his consent to search the

vehicle. The court specifically noted that at the time the officer received consent to search, the officer had neither returned the appellant's identification papers to him, nor given him a copy of the warning. Ultimately, the court concluded that the officer's request for consent to search after he had determined he was going to write a warning was appropriate when he had not yet returned the driver's papers or issued the warning. *Id.; see also Sims*, 356 Ark. 507, 157 S.W.3d 530 (holding that the legitimate purpose of the traffic stop has ended *after* the officer hands back the driver's license and registration, along with a warning ticket).

■ In this case, Jackson does not challenge and, in fact, concedes that Corporal Behnke had probable cause to initiate the traffic stop. He argues that the ensuing detention was illegal because the purpose of the stop had been completed before the officer deployed K–9 Major. We disagree. At the suppression hearing, Corporal Behnke testified that after running the driver's licenses of both Jackson and Maysonet and checking the vehicle's VIN number, he began writing a warning ticket that he planned to issue unless the check of their licenses revealed any warrants. According to Corporal Behnke, he was still waiting for a return of criminal-history checks from ACIC for one of the men at the time he deployed K–9 Major. Moreover, he had not delivered a warning citation to the driver, nor had Maysonet signed the warning. Under the facts of this case and based on this court's precedent, we cannot say that the circuit court erred in denying the motion to suppress after finding that the purpose of the stop had not been completed at the time K–9 Major was deployed. Accordingly, because the initial purpose of the traffic stop was ongoing, there was no additional rea-

sonable suspicion required to deploy the canine.

We next address Jackson's argument that the circuit court erred in denying his motion to suppress the marijuana because the warrantless search of the vehicle was not reasonable. Specifically, Jackson argues that the factors noted by Corporal Behnke and the alert, without an indication, by K–9 Major were insufficient to establish probable cause to search the vehicle. The State asserts that we should affirm the circuit court's denial of the motion to suppress the marijuana because the positive canine alert by K–9 Major, whose reliability was established by the State, was sufficient to establish probable cause.

■ The Fourth Amendment to the United States Constitution states as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In general, a search is considered invalid absent a warrant based on probable cause to search. However, the United States Supreme Court first established the "automobile exception" to the warrant requirement in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), recognizing that the mobile nature of automobiles justifies a search, based on proba-

ble cause, even when a warrant has not yet been obtained.

■ Guidelines for warrantless searches of vehicles are set forth in Rule 14.1 of the Arkansas ₉Rules of Criminal Procedure, which provides in relevant part that a police officer

who has reasonable cause to believe that a moving … vehicle … contains things subject to seizure may, without a search warrant, stop, detain, and search the vehicle and may seize things subject to seizure discovered in the course of the search where the vehicle is:

(i) on a public way.

Reasonable cause, as required by this rule, exists when officers have trustworthy information which rises to more than mere suspicion that the vehicle contains evidence subject to seizure and a person of reasonable caution would be justified in believing an offense has been committed or is being committed. *E.g., Reyes v. State*, 329 Ark. 539, 954 S.W.2d 199 (1997). Here, we are called upon to review whether a positive alert by a canine constitutes sufficient probable cause to search a vehicle.

This court has been presented before with the issue of whether a positive alert from a canine sniff, standing alone, constitutes probable cause to conduct a warrantless search of a vehicle, and we said it does. *State v. Thompson*, 2010 Ark. 294, 377 S.W.3d 207.[2] There, this court held that where a canine gave a positive alert, there was probable cause for an officer to search a vehicle. In that case, the officer testified as to the dog's reliability and con-

---

**2.** The issue in *Thompson* was analyzed pursuant to the Fourth Amendment, and this court specifically declined to analyze whether greater protections should be afforded under article 2, section 15 of the Arkansas Constitution. This court noted that the circuit court had not specified the basis for its ruling, that the issue

was not sufficiently developed on appeal, and that full adversarial development was lacking. *Thompson*, 2010 Ark. 294, 377 S.W.3d 207. Here, too, we lack a specific ruling and full adversarial development of the issue. Accordingly, our analysis is limited to the Fourth Amendment.

firmed that his training records had been maintained. *Id.* This court in deciding *Thompson* relied on a decision by the Eighth Circuit Court of Appeals in *United States v. Sundby,* 186 F.3d 873 (8th Cir. 1999). There, the appeals court held as follows:

> A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable. To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs. An affidavit need not give a detailed account of the dog's track record or education.

*Id.* at 876 (citations omitted). Notably, there was no challenge to the canine's reliability in either *Thompson* or *Sundby.*

Since those cases, however, the United States Supreme Court has addressed the issue of a drug-dog's reliability in a case challenging whether a drug-dog's alert provided sufficient probable cause to conduct a search of the respondent's vehicle. In *Florida v. Harris,* — U.S. —, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013), a unanimous Court held that where training records established the canine's reliability in detecting drugs, and the respondent failed to undermine that showing, the trial court correctly ruled that an officer had probable cause to search the respondent's vehicle. In so ruling, the Supreme Court took issue with the Florida Supreme Court's ruling that "created a strict evidentiary checklist, whose every item the State must tick off" in direct contravention to the established standard of considering probable cause under the totality of the circumstances. *Id.* at —, 133 S.Ct. at 1056 (footnote omitted). The Court reasoned:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

*Id.* at —, 133 S.Ct. at 1057.

Remaining mindful of the Supreme Court's holding in *Harris,* we cannot say that there are any specific evidentiary items that will demonstrate, or necessarily refute, a drug dog's reliability. As with other issues that arise when one seeks to suppress evidence from a search and seizure, it is the circuit court that will be the ultimate arbiter of credibility. *E.g., Cockrell,* 2010 Ark. 258, 370 S.W.3d 197.

Here, in arguing that K–9 Major was not reliable, Jackson points to testimony calling into question the canine's track record, including the fact that K–9 Major, in 2011, alerted on vehicles with a no-find at a rate of fourteen percent. According to Jackson, this percentage is not reliable enough to establish probable cause, and when considered with the fact that the dog did not give a final indication, it was error for the circuit court to deem the dog reliable when determining whether probable cause existed. We disagree.

■ Corporal Behnke testified that K–9 Major is trained to detect marijuana, cocaine, heroin, methamphetamine, and ecstasy. He explained that he and K–9 Ma-

jor were trained by Arkansas State Police Canine Coordinator, Roby Rhoads. There were also three certifications related to Corporal Behnke's and K–9 Major's training introduced into evidence, including completion of the PSP–1, Police Dog Critical Skills Test; and the Narcotics Detector Dog Team PSP–2, Police Scenting Dog Test. Corporal Behnke explained that the PSP–2 is the standard used by the Arkansas State Police and was developed by behaviorists and ₁₂other dog trainers, with the consultation of the German police. Corporal Behnke also stated that he and K–9 Major conduct training throughout the year to make sure they stay proficient. Although Jackson put forth some evidence regarding false alerts by K–9 Major, the circuit court, after hearing testimony about Corporal Behnke and K–9 Major's training, ruled the dog was reliable. In light of the ruling in *Harris,* —— U.S. ——, 133 S.Ct. 1050, we cannot say this was clearly erroneous.

■ We also cannot say that the circuit court erred in finding that Corporal Behnke had probable cause to search the vehicle based on the alert by K–9 Major. Corporal Behnke testified that when dealing with K–9 Major there can be an alert, a profound alert, or an indication. He explained that an alert is a change in behavior that the handler knows and can recognize upon his own canine. He also testified that a profound alert is something that any human being, by sitting there and watching him, can understand that the dog has had a significant change in behavior. Finally, an indication, he explained, will either be a sit, stand, or lay. In this instance, Corporal Behnke stated that K–9 Major demonstrated a profound alert. More specifically, he stated that after conducting the free-air sniff, K–9 Major began pulling him toward the front-passenger side of the vehicle, to the point the dog

was almost choking himself. According to Corporal Behnke, the dog's behavior changed in that he exhibited excessive tail wagging and deep, labored breathing. As they neared the front of the vehicle, Corporal Behnke stated that K–9 Major turned to begin the detailed sniff, returned down the driver's side of the vehicle, and as they approached the rear tire, the dog stopped, turned back around, and began to sniff in the open driver's side window. According to ₁₃Corporal Behnke, at one point, K–9 Major was trying to get in through the window, which was unusual behavior for him. And, at another point, K–9 Major stood and stared at the door, a sign of an indication. In light of the evidence presented, we cannot say that the circuit court erred in denying the motion to suppress the marijuana seized from the vehicle on the basis that K–9 Major's alert constituted reasonable suspicion for the search.

■ Finally, Jackson argues that the circuit court erred in denying his motion to suppress his custodial statement made after an illegally obtained statement in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the fruit-of-the-poisonous-tree doctrine. In this regard, Jackson asserts that he never waived his rights under the Fifth and Sixth Amendments to the United States Constitution, and article 2, section 8 of the Arkansas Constitution. Thus, according to Jackson, because his second statement was the result of the first illegally obtained statement, it should be suppressed as fruit of the poisonous tree. Alternatively, he asserts that if this court finds that he did waive those rights, Corporal Behnke should not benefit from his unlawful conduct at the scene of the stop. The State argues to the contrary that because Jackson's statement at the police station was not the product of a "question

first" interrogation tactic, but was a spontaneous statement uttered while refusing to answer further questions, this court should affirm the circuit court's denial of the motion to suppress the custodial statement.

■ A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *E.g., Leach v. State,* 2012 Ark. 179, 402 S.W.3d 517. In order to determine whether a waiver of *Miranda* rights is voluntary, this ₁₄court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* In order to make this determination, this court reviews the totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.* The fact that the defendant is not a stranger to the criminal-justice system is a factor to be considered in determining whether a custodial statement was voluntarily made. *E.g., Sweet v. State,* 2011 Ark. 20, 370 S.W.3d 510. This court will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id.*

In advancing his argument that his custodial statement should be suppressed, Jackson relies on the Supreme Court's decision in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). There, the defendant was interrogated by police at the station without being read her rights. She confessed; then, after a twen-

ty-minute break, the officer read the *Miranda* rights to her, and she again confessed. The officer admitted that this was a conscious tactic, and as noted by the Supreme Court, it was an interrogation technique in which the officer would elicit a prewarning statement from the defendant, give the *Miranda* warnings, and then obtain a second statement that would be "largely a repeat of information ... obtained" prior to the warning. *Id.* at 606. Thus, the question presented in *Seibert* was whether the second statement was admissible. The Supreme Court ultimately excluded both the pre- and post-₁₅*Miranda* statements, finding that the "question-first tactic effectively threatens to thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted." *Id.* at 617, 124 S.Ct. 2601. In so doing, the Court concluded that in such circumstances a midstream recitation of warnings after an interrogation and an unwarned confession rendered the *Miranda* warnings ineffective. *Id.* at 604, 124 S.Ct. 2601. More specifically, as explained by the Supreme Court, "[t]hese circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 617, 124 S.Ct. 2601 (footnote omitted).

While Jackson relies on the decision in *Seibert* to support his argument that the custodial statement should be suppressed, the facts as presented here are clearly distinguishable from those in *Seibert.* And, in fact, are more akin to those presented in the Supreme Court decision of *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). There the court was confronted with the issue of whether an initial failure by law-enforcement officers to administer *Miranda* warnings, without more, tainted subse-

quent admissions after a suspect had been advised and then waived his *Miranda* rights. In that case, an officer, in speaking to the appellant who was suspected in a burglary, told the appellant that he believed he was involved in the burglary, to which the appellant replied, "Yes, I was there." *Id.* at 301, 105 S.Ct. 1285. The appellant had not been advised of his *Miranda* rights at that time. He was then transported to a sheriff's office, where he was advised of his *Miranda* rights, which he then waived, giving a full statement implicating himself in the burglary. The appellant's motion to suppress his custodial statement as fruit of the poisonous tree was rejected. That denial was reversed on appeal by the Oregon Court of Appeals, and the Supreme Court granted certiorari. In ruling that the subsequent statement was admissible and was not impermissibly tainted by the previous statement, the Court reasoned:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309, 105 S.Ct. 1285.

Here, after being advised of his *Miranda* rights, Jackson stated that he would not answer any questions because "[t]here's nothing for [him] to say because [the police] already [had his] weed." There was no evidence that Corporal Behnke's initial failure to advise Jackson of his *Miranda* rights on the roadside was purposeful or part of an interrogation-first tactic, such that his custodial statement should be suppressed as fruit of the poisonous tree. There is simply no merit to Jackson's contention that the coercive nature of events surrounding the first statement requires suppression of the second statement. As the Supreme Court stated in *Elstad,*

> The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver.

470 U.S. at 318, 105 S.Ct. 1285. In this case, we cannot say that the circuit court erred in finding the custodial statement to be admissible when it was made after *Miranda* warnings that were clearly effective, as Jackson invoked his right to remain silent.

Affirmed; Court of Appeals' opinion vacated.

HANNAH, C.J., and BAKER, HART, JJ., and Special Justice GREGORY T. JONES concur.

HOOFMAN, J., not participating.

JIM HANNAH, Chief Justice, concurring.

I concur that the circuit court's decision denying Jackson's motion to suppress should be affirmed. However, I write separately to state how I reached that conclusion.

As the majority states, Jackson presents three issues on appeal: (1) whether the evidence was seized in the course of an illegal detention, (2) whether the warrantless search of his vehicle was reasonable, and (3) whether the custodial statement violated his *Miranda* rights and the fruit-of-the-poisonous-tree doctrine.

As the majority notes, Jackson does not challenge the legality of the traffic stop that Corporal Behnke testified was for an "[i]mproper lane change, cutting in front of a tractor trailer, and following too close." The issue is whether Corporal Behnke unlawfully detained Jackson. Once the legitimate purpose of a valid traffic stop is over, to detain a person, a law-enforcement officer must have reasonable suspicion that the person stopped is about to commit a felony or a misdemeanor involving danger or forcible injury to persons or of appropriation or damage to property. *See Sims v. State,* 356 Ark. 507, 157 S.W.3d 530 (2004); Ark. R. Crim P. 3.1 (2012). However, as part of the traffic stop, a law-enforcement officer may carry out certain routine tasks:

> This detention is, of course, unrelated to a Rule 3.1 detention. The Eighth Circuit Court of Appeals has discussed the detention associated with a valid traffic stop succinctly:
>
> > [H]aving made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. *See United States v. Carrazco,* 91 F.3d 65, 66 (8th Cir.1996). During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered.
>
> *Laime v. State,* 347 Ark. 142, 157–58, 60 S.W.3d 464, 474–75 (2001) (quoting *United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 647 (8th Cir.1999)).

According to the majority, Corporal Behnke "was still waiting for a return of criminal-history checks from ACIC for one of the men at the time he deployed K–9 Major." While Corporal Behnke's testimony was mixed on when, or if, he ever received a report on the ACIC/NCIC check, there was evidence from which the circuit court could have concluded that Corporal Behnke had not received the report at the time Major was deployed to run around the vehicle to check for contraband. Therefore, at that time, the traffic stop was still ongoing, and this court need look no further. Rule 3.1 had not come into play, and there is no merit to Jackson's argument that he was unlawfully detained at the time Major was utilized.

Nonetheless, the majority goes on to state, "Jackson acknowledges that there is case law suggesting that a stop is not completed until the driver's license and any accompanying paperwork is returned, which is precisely what we recently stated in *Menne* [*v. State* ], 2012 Ark. 37, 386 S.W.3d 451." In *Menne,* this court stated,

> Two issues confront this court in the instant case. The first is whether the purpose of the traffic stop was over at the time Trooper Roark requested Menne's consent to search the vehicle. The second issue is whether Roark devel-

oped a reasonable suspicion during the course of the traffic stop that was a sufficient basis to detain Menne further.... Countering that, however, is Menne's assertion that the warning citation was not provided to her by Roark because he was waiting for the K–9 unit to begin the dog sniff. Because we conclude that Roark had reasonable suspicion to detain Menne, we need not resolve the first issue.

*Id.* at 5–6, 386 S.W.3d 451, 454–55 (citations omitted). *Menne* does not stand for the proposition that a traffic stop is not completed until paperwork is returned. For this same proposition, the majority also relies on *Yarbrough v. State,* 370 Ark. 31, 257 S.W.3d 50 (2007); but, in that case, the evidence accepted by the circuit court was that the officer "was in the process of writing the warning before consent was requested and obtained." *Yarbrough,* 370 Ark. at 39–40, 257 S.W.3d at 57. This court in *Yarbrough* stated further as follows:

> In *Lilley v. State,* [362 Ark. 436, 208 S.W.3d 785 (2005)], we viewed the traffic stop as completed after the warning and vehicle documentation were handed to the driver. Likewise, we said in the *Sims* case that the legitimate purpose of the stop had terminated *"after* [the officer] handed Sims back his driver's license and registration, along with a warning for [the traffic offense]...." *Sims v. State,* 356 Ark. [507] 513, 157 S.W.3d [530], 534. Based on this case law, we cannot say that the circuit court's ruling is clearly against the preponderance of the evidence.

*Id.* at 39, 257 S.W.3d at 57.

There is no question that this court has concluded that handing back the paperwork and giving the person a warning or ticket constitutes a legally recognized indicia that the law-enforcement officer has

completed the traffic stop. However, the majority errs in concluding that the legal length of the traffic stop is controlled by when paperwork is returned. A law-enforcement officer does not control the length of the stop by when he or she returns paperwork. In other words, a law-enforcement officer may not withhold paperwork in order to extend the traffic stop beyond the time permitted by law. The majority errs in stating, "While we may not have a bright-line rule for when a stop is legitimately completed, our case law has consistently held that a stop is not concluded when the officer has not returned the license, paperwork, or ticket." The law is, that, "[o]nce the purpose of the traffic stop is completed, the officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *Yarbrough,* 370 Ark. at 38–39, 257 S.W.3d at 56–57; *Sims,* 356 Ark. at 514, 157 S.W.3d at 535 (citing *United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997)). Corporal Behnke indicated his understanding of this law in his testimony. He stated that he was still waiting for the ACIC/NCIC returns. He asked for consent to search the vehicle and testified "I didn't hold onto the ticket. I had written it out before I ran the dog around the car. I didn't give it to Mr. Maysonet 'cause the traffic stop was not complete yet." As already noted, the circuit court accepted Corporal Behnke's testimony that he was still waiting for return on the ACIC/NCIC report when the dog was instructed to run around the car. A law-enforcement officer may not extend the time for completion of the purpose of the traffic stop by retaining paperwork. Such a holding grants unfettered discretion and is impermissible.

With respect to Major's alert in this case, I agree with the majority that the circuit court should be affirmed in its finding that the alert provided probable cause for the search. As the majority notes, Corporal Behnke testified that Major made a profound alert to the point that he was choking himself on his collar. I agree that Major's certification, combined with Corporal Behnke's testimony about the alerts made by Major, satisfy the requirements under the Fourth Amendment. With respect to the use of dogs for various purposes, the United States Supreme Court has stated as follows:

Official conduct that does not "compromise any legitimate interest in privacy" is not a search subject to the Fourth Amendment. *[United States v.] Jacobsen*, 466 U.S. [109] [, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85] [(1984)]. We have held that any interest in possessing contraband cannot be deemed "legitimate," and thus, governmental conduct that *only* reveals the possession of contraband "compromises no legitimate privacy interest." *Ibid.* This is because the expectation "that certain facts will not come to the attention of the authorities" is not the same as an interest in "privacy that society is prepared to consider reasonable." *Id.,* at 122, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (punctuation omitted). In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110, (1983), we treated a canine sniff by a well-trained narcotics-detection dog as "*sui generis* " because it "discloses only the presence or absence of narcotics, a contraband item."

*Illinois v. Caballes*, 543 U.S. 405, 408–09, 125 S.Ct. 834, 160 L.Ed.2d 842, (2005). Distilled to its essence, the idea set forth by the United States Supreme Court is that no one is harmed by the use of a canine except those who have contraband, so there is no just cause to object to the use of the canine. I am not convinced that this approach comports with the average person's understanding of liberty. The ability to go about one's business without official interference is a core element of liberty. The rule at present with respect to traffic stops is, that if a canine can be obtained prior to completion of the traffic stop, the dog can carry out a sniff with or without the vehicle driver's and passengers' consent. How these issues might be resolved if they were properly raised below in the circuit court, ruled on, and developed before this court under the Arkansas Constitution remains to be seen.

I agree with the majority's conclusions and analysis regarding Jackson's custodial statement. However, for the reasons set forth above, I write separately on the other two issues.

BAKER and HART, JJ., join.

Special Justice GREGORY T. JONES, concurring.

I agree that the circuit court did not err in denying the motion to suppress after finding that the purpose of the stop had not been completed at the time K–9 Major was deployed. Yet, I write separately to address two aspects of the majority's opinion that give me pause.

### I. Standard of Review

The first pertains to our Court's standard of review. In outlining the applicable standard of review, the majority states:

In reviewing a circuit court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probably cause, giving due weight to inferences drawn by the circuit court and proper defer-

ence to the circuit court's findings. *E.g., Menne v. State,* 2012 Ark. 37, 386 S.W.3d 451.

A finding is clearly erroneous, even if there is evidence to support it, when the appellate court, after review of the entire evidence, is left with the definite and firm conviction that a mistake has been made. *E.g., Lee v. State,* 2009 Ark. 255, 308 S.W.3d 596. We defer to the superiority of the circuit court to evaluate the credibility of witnesses who testify at a suppression hearing. *E.g., Cockrell v. State,* 2010 Ark. 258, 370 S.W.3d 197. We reverse only if the circuit court's ruling is clearly against the preponderance of the evidence. *Ritter v. State,* 2011 Ark. 427, 385 S.W.3d 740. While that formulation is virtually identical to what appears in scores of search and seizure opinions that this Court has issued over the past two decades, it amounts to a conflation of multiple tests that is, at best, ambiguous and, at worst, self-contradictory. It needs to be re-tooled.

The lineage of this standard of review can be traced to at least two separate lines of authority that ultimately merged following *Davis v. State,* 351 Ark. 406, 94 S.W.3d 892 (2003). One line germinated following a concurrence by Justice Fogleman, who expressed dismay over the then-existing lack of any discernible standard of review for suppression cases. *Vault v. State,* 256 Ark. 343, 345–48, 507 S.W.2d 111 (1974). After summarizing the prevailing language on appellate review, he lamented: "I now confess I do not know what this means." *Id.* at 345, 507 S.W.2d 111.

Justice Fogleman's plea for a new standard was promptly answered in *Degler v. State,* 257 Ark. 388, 517 S.W.2d 515 (1974), wherein the Court unveiled the "clearly against the preponderance of the evidence test."[1] This formulation was derived from a review standard that had been employed for chancery court appeals and was apparently viewed as a close cousin to the "clearly erroneous" standard that the United States Supreme Court had championed in *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). This language, and alternative forms of it, *see, e.g., Cook v. State,* 293 Ark. 103, 105, 732 S.W.2d 462 (1987); *Findley v. State,* 300 Ark. 265, 269, 778 S.W.2d 624 (1989) ("if we find the evidence to preponderate against the findings of the trial court, then it is our duty to reverse."), periodically crop up in subsequent decisions leading into the twentieth century. *See, e.g., Laime v. State,* 347 Ark. 142, 153, 60 S.W.3d 464 (2001).

But by 2003, we found it necessary in the wake of *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), to develop the second line of authority for reviewing suppression cases. Thus, in *Davis v. State,* 351 Ark. 406, 94 S.W.3d 892 (2003), we jettisoned other language that had infiltrated our standard of review, *see, e.g., Laime,* 347 Ark. at 152, 60 S.W.3d 464 (2001)(requiring us to "view the evidence in the light most favorable to the State"), and reformulated it to read:

> Our standard is that we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court.

1. The Court announced: "We now set the issue at rest by stating explicitly that in each case we will make an independent determination based upon the totality of the circumstances and that the trial judge's findings of voluntariness will not be set aside unless it is clearly against the preponderance of the evidence." 257 Ark. at 392, 517 S.W.2d 515.

*Davis,* 351 Ark. at 413, 94 S.W.3d 892 (2003) (citing *Ornelas).* Although this language is, at first blush somewhat paradoxical, the *Davis* test properly charts the multi-step analysis that an appellate court must conduct as it evaluates the mixed questions of law and fact that underlie a proper analysis of reasonable suspicion and probable cause. Significantly, the "clearly against the preponderance of the evidence" language was not mentioned as having any role in the analysis.

But by 2007, such "clearly against the preponderance of the evidence" verbiage inexplicably started re-appearing as a sort-of legal coda to the *Davis* search and seizure standard of review. *See, e.g., Yarbrough v. State,* 370 Ark. 31, 36, 257 S.W.3d 50 (2007)(citing *Laime).* That approach has continued, albeit inconsistently, up through the present. *E.g., Menne v. State,* 2012 Ark. 37, at 5, 386 S.W.3d 451. *But see State v. Thompson,* 2010 Ark. 294, at 5, 377 S.W.3d 207 (omitting such language in reversing the grant of a motion to suppress).

Regardless of its pedigree, the "clearly against the preponderance of the evidence" clause muddles what is already a somewhat-challenging[2] test. Fusing the preponderance of the evidence" language (which our civil juries are asked to employ in civil trials) with the additional adverb "clearly" creates a hybrid that admits of no easy interpretation. Does it mean "clearly against the greater weight of the evidence?" If so, then that seems to fall short of the "clearly erroneous standard." And if it is simply another way of saying "clearly erroneous" then it is confusingly redundant.

But beyond those inquiries, a more pressing question remains: to which part

of "the circuit court's ruling" does it apply? Does it apply strictly to findings of fact or does it also apply to conclusions about the existence of probable cause or reasonable suspicion? If applied to the latter, then how can it be squared with an appellate court's mission to conduct a de novo review? Taken in context, I (like Justice Fogleman in *Vault*), do not know what our standard means.

Given such deficiencies inherent in the "clearly against the preponderance of the evidence" language, I respectfully submit that it is time to permanently retire the phrase from our search-and-seizure parlance and to return to the language that *Davis* announced, though with a slight clarifying elaboration. Such elaboration is merited since the threshold test articulated—that we will conduct a de novo review—may seem inconsistent with subsequent language stating that we will review "findings of historical facts for clear error and determin[e] whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court." How can these two seemingly-contradictory standards co-exist for the same core issue?

Fortunately, the two clauses can be harmonized. The explanation lies in the fact that the two standards apply to different aspects of the analytical process that an appellate court must employ when reviewing probably cause and reasonable suspicion rulings. Circuit courts and appellate courts addressing search and seizure issues seldom have the luxury of facing undisputed fact patterns. In general, it is the trial judges who sit in a far better position than we to evaluate the testimony because "they are there"; we are not.

(Scalia, J., concurring).

**2.** *See United States v. Arvizu,* 534 U.S. 266, 278, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)

For that reason, we must indulge a healthy dose of deference to the circuit court's superior position to determine the credibility of the witnesses at suppression hearings and the weight to be accorded to their testimony. *Cockrell v. State*, 2010 Ark. 258, at 10, 370 S.W.3d 197; *Flanagan v. State*, 368 Ark. 143, 154, 243 S.W.3d 866 (2006). In a related vein, we must give due deference to the circuit court's findings of historical facts—for example, what events led up to the stop or search, what statements were (or were not) made during the course of the seizure, whether the detainee was *Mirandized* or, as in the case at bar, whether a dog handler reasonably inferred that his dog actually alerted to illegal drugs. Accordingly, the circuit *court's findings of historical facts* may not be overturned unless the appellate court, after review of the entire evidence, is left with a definite and firm conviction that a mistake has been made. *E.g., Lee v. State*, 2009 Ark. 255, at 4, 308 S.W.3d 596.

Yet such deference evaporates when assessing whether the facts give rise to a determination of reasonable suspicion or probable cause. As the United States Supreme Court pointed out in *Ornelas*, "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." 517 U.S. at 699, 116 S.Ct. 1657. That is because such determinations ultimately involve mixed questions of law and fact. Only by exercising de novo review can appellate courts appropriately unify precedent which, in turn, can enable law enforcement officers to make better and more-informed decisions in the field. *See id.* at 697–98, 116 S.Ct. 1657; *United States v. Arvizu*, 534 U.S. 266, 275, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Thus, it is up to the appellate court to reach the legal conclusion whether, under the totality of the circumstances and |₂₇considering the historical facts as addressed by the circuit court, a reasonably-objective police officer either would have reasonable suspicion that the person stopped has committed, or is about to commit, a criminal act, or would have probable cause to believe that, upon search, contraband or evidence of criminal activity will be found.

Distilled to its essence, the appellate court must apply a clearly erroneous standard over the circuit court's historical factual findings[3] and then employ a de novo review as it determines whether those facts—taken in totality—indeed constitute reasonable suspicion or probable cause.

This interlude into the ramifications of standard of review sets the stage for what is a crucial issue in this case. I agree that, under *State v. Thompson*, 2010 Ark. 294,

---

**3.** It may be that, at some point, certain types of evidence and the manner in which they are preserved in the record may render obsolete the very justification for deference to the trial court. Thus, with the proliferation of "dash cam" and surveillance video evidence, an appellate court may arguably be in as good a position as the trial court to evaluate certain historical facts, assuming no corresponding authenticity or credibility-related issues need to be addressed. *Cf. Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (reaching vastly different interpretations from those of the district court and Court of Appeals upon review of "dash cam" videotape depicting police chase of motorist). To the extent that an appellate court's analysis of probable cause or reasonable suspicion rests in part on interpretations of unchallenged video or audio evidence then arguably the justification for deference to he trial court's "better position" to evaluate facts tends to fade. And yet, there are countervailing notions rooted in the very structure of our trial court—appellate court system that suggest that fact-finding lies most appropriately in the trial courts' domain. In this case, the video was in my opinion inconclusive. Given the fact that the trial judge was both able to review it *and* to hear live testimony about it, I feel compelled to defer to the circuit court's factual findings and related inferences on this point.

377 S.W.3d 207, a positive canine sniff can provide probable cause for the subsequent vehicle search. Yet in this instance, it appears that K–9 Major was not actually deployed until slightly more than 15 minutes after the traffic stop had commenced. It is well-established that, after routine checks and related paperwork are completed during the course of a lawful traffic stop, "continued detention of the driver can become unreasonable" unless the officer has developed adequate reason to suspect that criminal activity is afoot. *Sims v. State*, 356 Ark. 507, 514, 157 S.W.3d 530 (2004). Mr. Jackson argues that Trooper Behnke had sufficient time to complete the ticket-writing process and that he had developed no additional reasonable suspicion during the course of the traffic stop to justify Jackson's continued detention. Thus, the question is: had the initial stop ended by the time Trooper Behnke developed probable cause to initiate a warrantless search? This turns on whether the purpose of the initial stop had ended by the time K–9 Major performed his sniff.

## II. *Determining the End Point of the Traffic Stop*

In addressing the question of when a traffic stop legitimately ends, the majority properly recognizes that "there is no bright-line rule, as it would likely create an inflexibility that is at odds with Rule 3.1" of the Arkansas Rules of Criminal Procedure. Yet the majority then observes: "While we may not have a bright-line rule for when a stop is legitimately completed, our case law has consistently held that a stop is not concluded when the officer has not returned the license, paperwork or ticket." (citing *Yarbrough v. State*, 370 Ark. 31, 257 S.W.3d 50 (2007)).[4]

This gives rise to my second point of concern with the majority opinion. I agree that *Yarbrough* and *Sims v. State*, 356 Ark. 507, 157 S.W.3d 530 (2004), both underscore that the traffic stop normally has not ended until the paperwork has been completed. *See also Menne v. State*, 2012 Ark. 37, at 5–6, 386 S.W.3d 451. But whether construed as a "bright-line rule" or merely as a "consistent holding," I do not read any of these decisions to support the notion that, just because the paperwork has *not* been returned, the stop cannot be challenged as unduly protracted. While such a rule might add predictability and simplicity to the legal task, it could provide a fecund ground for mischief. To be sure, while the return of paperwork may be a presumptively-appropriate starting point to gauge the justifiable duration of an initial traffic stop, *Menne*, *Yarbrough*, and *Sims* should not be construed as creating some sort of safe harbor that immunizes an investigating officer's purposeful delay from judicial scrutiny. The State ultimately conceded as much in oral argument.

Thus, absent independent reasonable suspicion to detain a motorist, no officer should be empowered to delay completion or delivery of the traffic stop paperwork simply to continue trolling for probable cause or, in a case such as this one, to buy time so that the canine cavalry can arrive to save the day. *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005).

In the case at bar, Trooper Behnke claimed that he had cultivated reasonable suspicion to prolong the stop during the course of the traffic stop. Among other key "indicators" he noted that he had seen a road atlas, fast food wrappers, and a

---

4. The State invokes this principle as justification for the somewhat tardy drug sniff, arguing that "[t]he legitimate purpose of a traffic stop does not end … until the officer delivers the vehicle's documentation, along with a ticket or warning, to the driver." Brief at 10.

single small suitcase inside the pickup. The Trooper also noted that, according to its rental agreement, the pickup had been due to be returned the previous day. But such "evidence" proves too little. Indeed, if fast food wrappers and a road atlas (or GPS device) constitute legitimate touchstones for criminal activity, then the highways of Arkansas are hopelessly teeming with felons. His observation that the rental contract had recently expired might have added more vitality to his suspicions but for the fact Trooper Behnke never suggested that he felt that the vehicle was indeed stolen. Nor did he otherwise persuasively link the vehicle's status per se as a rental to potential evidence of criminality. *Cf. Dowty v. State*, 363 Ark. 1, 13, 210 S.W.3d 850 (2005) (officer asserted that drug dealers routinely use rental cars to avoid seizure of their personal vehicles upon arrest).

Were these the universe of Trooper Behnke's justification for initiating the warrantless search, then in conducting our de novo review for probable cause, I would deem the search unconstitutional. *See Lilley v. State*, 362 Ark. 436, 442–44, 208 S.W.3d 785 (2005). But those did not comprise Trooper Behnke's full menu of criminal "indicators." In addition to pointing to the occupants' demeanor and delayed answers to questions, Trooper Behnke relied upon the drug sniff that K–9 Major undertook beginning roughly 15 minutes 44 seconds after he had stopped the pickup.

It is here that our duty to give deference to the trial court's determination of historical facts must take center stage. For the circuit court's decision that the Trooper truly was still waiting for a return of the criminal history check from ACIC is pivotal.[5] While the record on that point is not crystal clear, such a factual determination requires our deference. As such, I cannot say that I have a definite and firm conviction that the circuit court made a mistake.

Accordingly, I agree that the deployment of K–9 Major took place during the course of the initial stop. If K–9 Major was "reliable" and if Trooper Behnke had adequate basis to conclude that he indeed had alerted, then Trooper Behnke had probable cause to conduct the subsequent warrantless search. The majority found no basis to conclude that the circuit court was clearly erroneous in reaching these findings of historical fact. And based on the record before us, I must agree.

### III. *The Canine Sniff Reliability /Probable Cause Framework*

One final observation regarding the evidentiary thicket surrounding drug sniff cases bears mentioning. The Court of Appeals dispatched with the challenge to the drug dog's reliability by stating "Trooper Behnke provided both his and his dog's training and certification records. That is all that is required to establish the dog's reliability." 2012 Ark.App. 508, at 5, 2012 WL 4194657. That somewhat oversimplifies the analysis where, as here, the defendant challenged reliability. To be sure, particularly in light of *Florida v. Harris*, 568 U.S. ——, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013), the State's threshold burden is to establish *either* that a *bona fide* organization certified the K–9 after testing the dog in a controlled setting *or* that the dog recently and successfully completed a training program that evaluated his proficiency in locating drugs. If the State fails on both of these inquiries, then no probable cause based on the canine sniff can normally exist because the officer could

---

**5.** Implicit in that decision is the recognition that Trooper Behnke did not drag his feet on the paperwork in order to initiate a delayed canine sniff.

not have *reasonably* relied on the dog's alert.

On the other hand, if the State meets its threshold burden, then the defendant still has several avenues through which to attack the canine sniff as a basis for probable cause. First, the defendant may prove that the certification or training program was too lax or employed faulty methods.[6] Second, the defendant may seek to establish that, though certified, the dog did not perform adequately in either the training/certification program or in field performance. Such proof may undermine the dog's reliability, which could vitiate the existence of probable cause. Third, should the defendant fail to convince the trial judge of such inadequate performance, the defendant may then seek to challenge the dog handler's credentials by proving that the handler was not properly trained to correctly interpret the dog's actions. To complete the analysis, the trial judge should then determine whether the handler's account of the dog's alert was indeed credible.[7]

In the case at bar, the State offered up proof that K–9 Major had been certified and that he and Trooper Behnke had completed training programs that evaluated the dog's proficiency. The State offered the video of the stop, as captured by the camera in the Trooper Behnke's car and had the Trooper comment on what was shown therein. The defendant did not mount a strong challenge to the certification or training programs and instead focused his primary challenge on K–9 Ma-

jor's track record in the field—specifically his roughly 14% false positive rate—and attacked Trooper Behnke's conclusions through cross-examination and through his own K–9 expert witness. But in the final analysis, the trial judge weighed the proof, and concluded that Trooper Behnke had a proper basis for interpreting K–9 Major's labored breathing and approach to the pickup's window as evidence of an alert, which in turn, provided Trooper Behnke with probable cause to search the vehicle. Since the trial court was able to watch and listen to the testimony of Trooper Behnke and the Defendant's K–9 expert, I cannot say that our review of the record compels a different conclusion.

---

6. For example, a defendant may seek to prove that the dog was not subjected to sufficiently diverse environments or that blind testing (in order to prevent cueing) was not employed by the handler. If the defendant succeeds in establishing that the program was too lax or riddled with faulty methods, then, again, the Officer could not have *reasonably* relied on the dog's alert.

7. This determination may rest on such issues as whether the Officer cued the dog (consciously or unconsciously), whether the team was working in unfamiliar conditions, or whether the handler's account is belied by video, audio, internal inconsistency, or other credible testimony.